PER CURIAM.
11This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, John E. Demoruelle. For the reasons that follow, we suspend respondent from the practice of law for a period of two years.
INTRODUCTION
The procedural history of this case is somewhat complicated. In March 2004, the ODC filed two counts of formal charges against respondent. The formal charges alleged that respondent neglected legal matters, failed to communicate with his clients, failed to file annual accountings for a trust of which he served as trustee, and made unauthorized withdrawals from the trust for his personal use. The formal charges were served upon respondent by certified mail, but he failed to file an answer. Accordingly, the factual allegations contained therein were deemed admitted and proven by clear and convincing evidence. Following review, both the hearing committee and the disciplinary board recommended that respondent be suspended for one year, fully deferred, and be required to make restitution to the trust. Although neither respondent nor the ODC objected to the recommendation, this court on its own motion ordered briefing from the parties on the issue of an appropriate sanction. After receiving the briefs, we accepted the recommendation of the disciplinary board 12and suspended respondent from the practice of law for one year, which was deferred in its entirety subject to a one-year period of probation. In re: Demoruelle, 05-0852 (La. 12/16/05), 916 So.2d 1028.
The ODC then applied for rehearing, asserting that the discipline imposed by this court was unduly lenient. On February 17, 2006, we granted rehearing, vacated the deemed admitted order, and remanded the matter for a full hearing before a hearing committee, stating:
[W]e cannot come to a reasoned conclusion regarding the appropriateness of the sanction recommended by the disciplinary board based on the record before us. Under these circumstances, the interests of justice compel us to set aside the deemed admitted order and remand the formal charges for a full hearing before the hearing committee.
In October 2006, the ODC amended the formal charges against respondent. The matter is now before the court again based on the disciplinary board’s new recommendation in light of the amended charges and evidence developed at the formal hearing.
UNDERLYING FACTS

Count I

On November 22, 1979, Charles Ray Manuel was seriously injured in an automobile accident, which left him a quadri *96 plegic and brain damaged. Charles was interdicted in March 1980, and his mother, Anna Manuel, was appointed curatrix of his estate. In her capacity as curatrix, Mrs. Manuel filed suit on behalf of Charles against the parties responsible for his injuries. On December 29, 1980, the parties reached a structured settlement totaling $1,295,00o.[1] Respondent’s law partner, |sDouglas Hebert, handled the personal injury case, and respondent received a portion of the attorney’s fees paid to the law firm.
In 1981, Mrs. Manuel established an Irrevocable Inter Vivos Trust (the “trust”) to receive the proceeds of Charles’ settlement. The court appointed Terry Hebert, Douglas Hebert’s wife, to act as trustee.
In May 1982, after ending his partnership with Mr. Hebert, respondent began representing Mrs. Manuel. On her behalf, he filed a petition to revoke the trust, then amended the petition to request that Mrs, Manuel instead be appointed as the new trustee. In January 1983, respondent filed a petition on behalf of Mrs. Manuel and her husband asserting a claim against Charles’ estate in the amount of $500 per month for maintenance and support. Respondent filed the petition despite the fact that the claim conflicted with Mrs. Manuel’s duties as curatrix.[2] Mrs. Manuel then requested that respondent serve as trustee. On May 16, 1983, respondent was appointed the trustee of the trust by order of the 33rd Judicial District Court in response to a joint petition to appoint a successor trustee filed by respondent and Mrs. Hebert.
At the time of respondent’s appointment as trustee, Mr. Hebert continued to collect attorney’s fees due from the personal injury representation, and respondent, acting as trustee, proceeded to pay all outstanding attorney’s fees due to Mr. Hebert.[3] As trustee, respondent also purchased land and constructed a home for Charles and |4his parents to share. Because the trust did not have enough money for such an expenditure, respondent mortgaged the property despite a provision in the trust that none of the trust’s property could be mortgaged. Charles was removed from a nursing home and moved into the new home. Under respondent’s administration, Charles paid a house note, homeowner’s insurance, utility bills, and automobile insurance for the family’s vehicle. Charles also made loans to family members and others, as well as gifts of cash.
As trustee, respondent also collected a monthly fee of approximately $300, which he alone determined and collected without approval of Mrs. Manuel or the court. Furthermore, respondent regularly represented Mrs. Manuel in her capacity as curatrix and in separate issues. Upon her direction, respondent collected his legal fees for these representations from the trust.
Respondent received Charles’ final $100,000 settlement payment in January *97 1996. Instead of depositing the payment into the trust account, he purchased a certificate of deposit in the trust’s name. He then used a portion of these funds to repay three loans he had obtained on behalf of the trust. However, the proceeds of one of the loans in the amount of $8,030, which respondent obtained in November 1996, cannot be accounted for because there is no evidence that this amount was ever deposited into the trust account. Nonetheless, respondent withdrew $8,181.43 from the certificate of deposit in January 1997 to repay the loan. On numerous occasions, respondent also withdrew funds from the certificate of deposit, incurring early withdrawal penalties, and deposited same into the trust account, thus closing out the certificate of deposit in April 1999.
On August 27, 1996, respondent wrote a check from the trust account to the “John E. Demoruelle Campaign” in the amount of $700. This check was issued | ¿without Mrs. Manuel’s authorization.[4] An independent audit of the trust’s bank records also revealed that respondent wrote numerous checks, totaling thousands of dollars, for unknown expenditures between December 1993 and April 2000, the time period for which the auditor was able to obtain records of the trust.
Respondent was also required to furnish “an annual account to the duly authorized curator of Charles R. Manuel.” Nevertheless, respondent has never provided an annual accounting to Mrs. Manuel or filed same with the court. Indeed, respondent maintained very few financial records to document the activity of the trust’s bank accounts.
In January 2000, the trust account began to incur NSF and overdraft fees, and by April 2000, the trust funds were entirely depleted. Thereafter, respondent informed Mrs. Manuel that there was no more money in the account.
In May 2000, Mrs. Manuel, through a family member, filed a disciplinary complaint against respondent, requesting that he provide an accounting of the trust account. Because respondent had not kept complete records of the trust, he was unable to provide the accounting to his client or the ODC.
The ODC alleged that respondent’s conduct violated Rules 1.3 (failure to act with reasonable diligence and promptness in representing a client), 1.4 (failure to communicate with a client), 1.5 (fee arrangements), 1.7 (conflict of interest), 1.15 (safekeeping property of clients or third parties), 2.1 (a lawyer shall exercise independent professional judgment and render candid advice in representing a client), 5.4(c) (professional independence of a lawyer), 8.4(a) (violation of the Rules of | ^Professional Conduct), and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct.

Count II

In July 1998, Debra Menard paid respondent $825 to represent her in a community property matter. In February 1999, Ms. Menard paid respondent $1,650 to handle her child custody matter. Ms. Menard made two additional payments to respondent in June 2000 totaling $240 to pay for court costs in the child custody matter.
*98 Respondent failed to reasonably communicate with Ms. Menard about the status of her cases. He also failed to exercise due diligence in having the custody matter brought to court for enforcement and modification of the visitation plan pursuant to his client’s wishes. Furthermore, respondent was required to notify opposing counsel of his client’s proposed summer visitation schedule by May 1st. Despite receiving the desired dates from his client before May 1st, respondent neglected to timely inform opposing counsel of the dates in 1999 and 2000.[5]
Ms. Menard terminated respondent’s services on November 27, 2000. Thereafter, she requested in writing on at least two occasions that respondent provide her with an accounting and a refund of any unearned fees. Respondent failed to respond to these requests.
In January 2001, Ms. Menard filed a disciplinary complaint against respondent. In October 2001, respondent finally provided an accounting to the ODC, which represented that he spent 18.7 hours on Ms. Menard’s cases, earning a total of $3,005.
17The ODC alleged that respondent’s conduct violated Rules 1.3, 1.4, 1.5, and 1.16(a) (declining or terminating the representation of a client) of the Rules of Professional Conduct.
DISCIPLINARY PROCEEDINGS
As previously noted, this matter was remanded for a formal hearing on the merits in 2006. During the hearing, respondent stipulated to the factual allegations of the Menard matter and agreed that he violated the Rules of Professional Conduct as alleged in Count II of the formal charges. He also agreed to submit the fee dispute with Ms. Menard to the Louisiana State Bar Association’s fee arbitration program.
The ODC introduced documentary evidence at the hearing, including transcripts of respondent’s sworn statements taken November 15, 2001 and April 10, 2006, and called the following witnesses to testify before the committee: Douglas Hebert, Terry Hebert, Anna Manuel, Joseph Young, and Ronald White. Respondent testified on his own behalf and on cross-examination by the ODC. He also called Kathryn Hollier to testify before the committee.[6]
Testimony of Douglas HebeRt
Mr. Hebert represented Charles in the personal injury matter during his partnership with respondent. While he carried primary responsibility for the personal injury matter, the fee was deposited into the partnership and divided between respondent and himself in accordance with the partnership agreement until the partnership was dissolved; thereafter, respondent did not receive any of the fees.
|8After the personal injury matter was settled, Mr. Hebert filed the petition for authority to establish the inter vivos trust on behalf of Mrs. Manuel. His wife, Terry Hebert, became the trustee because she had accounting experience and Mrs. Manuel felt comfortable with her. As trustee, Mrs. Hebert filed annual accountings.
Eventually, Mrs. Manuel decided she wanted to use the trust funds to build a house, but Mr. and Mrs. Hebert did not think it was an appropriate use of the money. Therefore, Mrs. Manuel hired respondent to remove Mrs. Hebert as the trustee. Mrs. Hebert agreed to resign as *99 trustee, and respondent became the trustee. Thereafter, Mr. and Mrs. Hebert had no further involvement in the matter. At the time of Mrs. Hebert’s resignation, none of the trust funds were in an investment portfolio.
Mr. Hebert has been the elected district attorney in Allen Parish since 1991. As district attorney, he employed respondent as an assistant district attorney. However, respondent recently resigned because of allegations of impropriety, stemming from these disciplinary proceedings, published in the local newspaper.
Testimony of Terry HebeRt
Mrs. Hebert prepared accountings of the trust while she was trustee because she considered it part of her job to account for any money that came in for Charles’ benefit. She also accounted for any expenditures and kept receipts. When Mrs. Manuel requested money to build a house for Charles, Mrs. Hebert had some concern about removing Charles from a nursing home where he was being well cared for. She was concerned Mrs. Manuel would not be able to take care of Charles outside of a nursing home. However, soon thereafter, she was served with pleadings requesting that she be removed as trustee, and she resigned instead of continuing to fight her removal. Mrs. Hebert recalled that the request for her removal was based on her |flhaving breached her fiduciary duties. Therefore, to prove she had not breached her duties, she provided a final accounting, which the court approved.
Testimony of Anna Manuel
Mrs. Manuel was 82 years of age at the time of her testimony. She could not recall why she wanted Mrs. Hebert removed as trustee. However, she trusted respondent “with all my heart” and “thought he could walk on water.” Her primary concern was taking care of Charles, which she still does with the help of Charles’ children.
Respondent never informed her how much money was in the trust and how it was being spent. She claimed that, when she would ask, respondent would tell her not to worry and that he was taking care of it. He also never told her the money would run out if they were not careful about how they spent it.
Regarding the campaign contribution respondent obtained from the trust, Mrs. Manuel indicated he never asked her permission and she never told him he could take the money. However, respondent has paid the $700 back to the trust.
Testimony of Joseph Young
Mr. Young is married to Mrs. Manuel’s daughter Carmel and is the chief of police in Oberlin, Louisiana. He testified that respondent was using the trust funds to pay Carmel for her help in caring for Charles. Some time in early 2000, one of the checks bounced, and when Carmel asked respondent about the check, he informed her there was no more money in the trust. Thereafter, the family filed a complaint against respondent with the ODC.
11 (According to Mr. Young, respondent never provided the Manuels with an accounting of the trust. Furthermore, no one in the Manuel family approved the $700 campaign contribution respondent obtained from the trust. However, later, Mr. Young received a cashier’s check in the amount of $700 from respondent, and he assumed the check was repayment of the campaign contribution.
On two occasions, respondent made a $100 contribution to Mr. Young’s chief of police campaign using money from the trust. Mr. Young never repaid the contributions because respondent said he would take care of it. Respondent also never *100 told him it might be improper for him to take campaign contributions from the trust.
Testimony of RoNald White
Mr. White, who audited the trust account for the ODC, was not able to obtain all of the trust records. He obtained records from both respondent and the bank, and using those records, he was able to create an accounting of the trust from 1994 to 2000, when it ran out of money. Neither respondent nor the bank had any records prior to 1994.
Mr. White used copies of the cancelled checks to determine the purpose of the payments. However, some of the can-celled checks were missing, and he was unable to determine the purpose of many payments. He did, however, determine that the expenditures from the trust after respondent became trustee were larger than the expenditures before he became trustee.
Regarding the final $100,000 settlement payment, Mr. White indicated that respondent used the funds to purchase a certificate of deposit, then withdrew funds from the certificate of deposit to pay back three loans. However, Mr. White could not | ^account for one loan in the amount of $8,030 because no corresponding funds were ever deposited into the trust account even though funds from the certificate of deposit were used to pay back the loan. Respondent could not provide him with any information other than to tell him to get a copy of the loan check from the bank that issued the loan; however, Mr. White was unable to get a copy of the check.
Regarding the $700 campaign contribution, respondent did not deny taking the money. Respondent also told him Mrs. Manuel had authorized the contribution, which Mrs. Manuel has denied.
Respondent’s Testimony at Sworn Statements and Hearing
Respondent testified that he and Mr. Hebei-t were law partners from 1979 to early 1982. Charles’ case was settled in late 1980, and settlement checks began to be paid while he and Mr. Hebert were still partners. He received a portion of the attorney’s fees that were paid while he and Mr. Hebert were still partners, despite doing only a limited amount of work on the case.[7] However, when the partnership ended, Mr. Hebert kept the case as his own, and respondent no longer received any attorney’s fees from it.
After his partnership with Mr. Hebert ended, respondent began representing Mrs. Manuel, who wished to use trust funds to build a house so she could take Charles out of the nursing home. He admitted that Mrs. Hebert “did everything right” as trustee. However, when Mrs. Hebert took issue with Mrs. Manuel’s request to buy land and build a house using trust funds, Mrs. Manuel requested that he help her take over the administration of the trust from Mrs. Hebert. Accordingly, respondent filed 112a petition to revoke the trust and allow Mrs. Manuel to administer Charles’ affairs. Then he amended the petition to withdraw the request to revoke the trust and instead requested that Mrs. Manuel replace Mrs. Hebert as trustee. He also admitted to filing a petition on behalf of Mrs. Manuel individually requesting that Charles pay her $500 a month. Although he recognized that Mrs. Manuel, as curatrix, had a fiduciary duty to preserve Charles’ funds, he stated that the only purpose of the claim was to get Mrs. *101 Hebert removed as trustee. Mrs. Manuel’s conflicted position of making a claim on Charles’ funds, which she, as curatrix, had a fiduciary duty to protect, did not occur to him. Thereafter, Mrs. Manuel requested respondent become trustee. Mr. Hebert told him Mrs. Hebert did not want to be involved anymore and she would withdraw her opposition if Mr. Hebert received the balance of his attorney’s fee from the structured settlement. Respondent agreed, and they wrote up an agreement modifying the payment schedule of the remaining fee of $103,666.66,[8] which the court approved. On May 16, 1983, the judge signed the order removing Mrs. Hebert as trustee and appointing respondent as successor trustee. This was the first and only time respondent acted as the trustee of a trust.
Regarding the purchase of the land and the building of the house for Charles, respondent could not remember if he obtained court approval before doing so and could not produce any evidence to show such court approval. The trust did not have enough money for such an expenditure; therefore, he obtained a loan for the trust and mortgaged the property. He was not aware of the provision in the trust instrument l1sthat stated none of the trust’s property could be mortgaged. Respondent then used money from the trust to repay the mortgage loan.
As trustee, respondent used the money from the structured settlement to pay Charles’ expenses: the mortgage payment (which loan was paid off in less than ten years), utilities, property taxes, homeowner’s insurance, nursing expenses (Mrs. Manuel received $250 per week and her daughter Carmel received $210 per week),[9] prescription drugs, food and clothing for Charles, car insurance and gasoline, presents for Charles’ children, and $7,000 to $8,500 for medical treatment for Charles’ child. Respondent acknowledged that he had a fiduciary duty to make sure the funds went to the care of Charles, but he was acting in accordance with Mrs. Manuel’s requests in paying the bills. He thought he was doing what was best for Charles because he was with his family, who was taking care of him. He also admitted to giving Mr. Young campaign contributions from the trust account, stating that he was helping Charles’ family member. Furthermore, he considered the Manuels to be above him in directing how the trust funds should be expended because the money was their son’s money and their family’s money.
Respondent acknowledged that he never provided an annual accounting of the trust, testifying that he “just neglected it” and had no excuse for his neglect. The only records he kept were the checkbook, and he did not have any records prior to 1994. He believed the records of the prior years were in a box in his office closet, but when he looked for them at Mr. White’s request, he could not find them. He believed they may have been disposed of during a remodeling of his office in 1999 or 2000. He did not keep a separate ledger for the trust, and the bank did not have records prior to 1994.
*102 |14In 1996, respondent received a $100,000 payment on behalf of Charles as the final payment of the structured settlement. He did not deposit the funds into the trust account. Instead, he used them to purchase a certificate of deposit in the trust’s name at a different bank because he wanted to help the other bank, which was new, build its deposits. When the trust account had insufficient funds, respondent would move money into it from the certificate of deposit. He never invested the other settlement funds because “[a]s the money was coming in, it went out.”
Respondent did not keep records of the $8,030 loan that is unaccounted for, and the lending bank would not provide the records to Mr. White despite having respondent’s permission to do so. He could not explain why there was no record of the loan proceeds being deposited into the trust account. He suggested the money may have been used to pay the $7,000 to $8,500 medical bill for Charles’ child. However, he had no recollection that this is what occurred, nor did he have any documentary evidence. Respondent denied converting the money to his own use, explaining that his “bookkeeping was so poor,” which was why he did not know where the money went.
Regarding the $700 campaign contribution, respondent assumed he had Mrs. Manuel’s permission to write the check because she encouraged him to run for district judge and told him she wanted to help him. However, he never directly asked her for permission to write the check. When he later found out she did not approve of the campaign contribution, respondent wrote a refund check payable to the trust and mailed it to Mr. Young.
The $12,540 in payments respondent received from the trust between 1994 and 1999 were for his trustee fees. His fee was approximately $300 per month. He did l^not seek court approval for the payments of his fee, and Mrs. Manuel never objected to the payments.
When the trust funds were depleted in 2000, respondent covered an overdraft of the account with his personal funds. He did not reconcile the bank statement every month, which was probably why the trust account balance fell below zero and the money eventually ran out. It was only when Charles’ sister Carmel asked him about a bounced check from the trust account that he informed the Manuels there was no more money.
He denied telling Mrs. Manuel that everything was going to be fine. However, he did admit to not keeping the Manuels informed, stating he was embarrassed by his failure to keep an accounting, for which he apologized. He claimed he was so preoccupied and consumed with his personal affairs that he “shut things out of my mind” and let the accounting get away from him. However, he admitted that the rest of his law practice never suffered because of his personal affairs.[10]
At some point during these disciplinary proceedings, Mrs. Manuel and her new attorney requested respondent resign as trustee. Respondent did so “after the last hearing I believe, or even after the Supreme Court ruled in the last proceeding.”
In mitigation, respondent testified that his wife suffers from paranoid schizophrenia and bipolar disorder. He explained that her condition began to deteriorate in 1979, following the birth of their youngest child. Since that time, she has been unable to care for herself and she now re *103 sides in an assisted living facility in Houston. Respondent admitted to paying more attention to taking care of his wife and raising five children on his own than he did to his law office.
| , (¡Finally, respondent testified that, a week before his April 2006 sworn statement, he resigned his position at the Allen Parish District Attorney’s Office, where he had worked since September 2001, because he did not want to embarrass the office by going through this disciplinary proceeding.

Hearing Committee Report

After considering the evidence and testimony presented at the hearing, the hearing committee rendered its report.
With respect to Count I, the committee made a finding of fact that respondent failed to provide an accounting of the trust, as required by the trust instrument, from the time he began serving as trustee on May 16, 1983 through January 2000, when the trust funds were depleted. It further found he failed to maintain complete and accurate records of his activities as trustee of the trust for the entire time he served as trustee and never communicated to Mrs. Manuel the financial status of the trust prior to the depletion of the trust funds. However, the committee determined that respondent expended the trust funds primarily according to Mrs. Manuel’s requests and instructions.
The committee observed that respondent did not convert or otherwise misappropriate for his own use or benefit any of the trust funds, with the exception of the $700 check written to his political campaign. As to this check, the committee found respondent did not have the express permission or authorization of Mrs. Manuel or any other member of Charles’ family to make a contribution to his political campaign. However, the committee noted that respondent subsequently delivered a $700 check, made payable to the trust, to Charles’ brother-in-law in response to the hearing committee’s original recommendation of sanctions in this matter.
117Based on these findings, the committee determined that respondent violated Rules 1.3, 1.4, 1.15, 8.4(a), and 8.4(c) of the Rules of Professional Conduct with respect to Count I. The committee also determined that respondent acted without any intention to cause harm or injury to Charles in his handling of the trust.
Turning to Count II, the committee noted that respondent stipulated to the factual allegations and rule violations contained in the formal charges. Accordingly, the committee determined that respondent violated Rules 1.3, 1.4, 1.5, and 1.16(a) of the Rules of Professional Conduct as alleged in Count II.
In mitigation, the committee found the following: absence of a prior disciplinary record, personal or emotional problems, cooperation with the ODC in its investigation, and remorse. Furthermore, respondent accepted full responsibility for his actions and inactions as trustee and, at no time, denied the allegations asserted in the formal charges. The committee did not make any reference to aggravating factors in its report.
Under these circumstances, the committee recommended that respondent be suspended from the practice of law for one year, fully deferred.
The ODC filed an objection to the hearing committee’s report and recommendation.

Disciplinary Board Recommendation

After review, the disciplinary board determined that the hearing committee’s factual findings with respect to Count I are not manifestly erroneous. The board agreed that respondent violated Rules 1.3, 1.4 and 2.1 by failing to maintain adequate *104 accounting records for the trust and failing to keep Mrs. Manuel informed about the financial status of the trust. It further found respondent violated Rule 1.5 by failing 11sto obtain court or curator approval of the fee he charged as compensation for his duties as trustee,[11] and violated Rule 5.4(c) by merely submitting to requests for money from Charles’ relatives, without question, thereby allowing his professional judgment to be compromised by the requests of other parties.
For purposes of Rule 1.15, the board observed that because of respondent’s poor record-keeping, the history of the trust account from 1983 to 1993 is unknown and unaccounted for. However, the board determined that respondent is presumed to have converted $8,030 of Charles’ funds, as he had control of the funds and possessed them at one point, but they are unaccounted for now. The board found respondent has not offered sufficient evidence to overcome the presumption of his conversion.
With regard to the $700 check written by respondent to his campaign, the board found respondent engaged in a conflict of interest when he unilaterally decided to take money from the trust to fund his political campaign. The board also concluded he violated Rule 8.4(c) by making an unauthorized $700 withdrawal from the trust account for his political campaign, and observed that although he ultimately returned the money to the trust, he did not return the money until after the first hearing committee filed its report on the deemed admitted charges.
With respect to Count II, the board determined that respondent violated the Rules of Professional Conduct as alleged in the formal charges. The board also noted that respondent planned to submit the matter to fee dispute arbitration.
Turning to the question of the appropriate sanction, the board determined that respondent knowingly violated duties owed to his clients and the legal profession. |19It further determined his conduct resulted in significant harm to Charles, whose trust was completely depleted. It further presumed that respondent converted $8,030 in trust funds for which he could not account. Citing the ABA’s Standards for Imposing Lawyer Sanctions, the board determined that the baseline sanction is suspension.
In mitigation, the board found the following factors: absence of a prior disciplinary record, personal or emotional problems, cooperation with the ODC in its investigation, and remorse. In aggravation, the board found vulnerability of the victims, substantial experience in the practice of law (admitted 1968), and indifference to making restitution.
Considering these factors, the board recommended that respondent be suspended from the practice of law for three years.
Respondent filed an objection to the disciplinary board’s recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
DISCUSSION
Bar disciplinary matters fall within the original jurisdiction of this court. La. Const, art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 *105 So.2d 343; Louisiana State Bar Ass’n v. Boutall, 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee’s factual findings. See In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.
|2oWith regard to Count I, we find respondent failed to maintain adequate accounting records for the trust, failed to keep Mrs. Manuel informed about the financial status of the trust, failed to obtain approval of the fee he charged as compensation for his duties as trustee, and allowed his professional judgment to be compromised by the requests of other parties. While each of these conclusions is clearly supported by the record, a few points warrant particular mention. First, this matter is more than a routine case of inadequate accounting and poor trust management. Rather, we are presented with a situation in which respondent’s utter failure to maintain records, coupled with his mismanagement of his client’s trust, resulted in the unaccountable loss of $8,030 in trust funds. Second, respondent’s failure to obtain approval of his fee as trustee was not his only failure with regard to his duties in that capacity. We note that the trust instrument clearly provided that the property of the trust was not to be mortgaged, but nonetheless, respondent did so.
Turning to Count II, respondent has stipulated that he failed to communicate with Ms. Menard, neglected her legal matter, and failed to provide her with an accounting and a refund of any unearned fees. Based on this stipulation, we conclude the ODC has proved that respondent’s conduct violated Rules 1.3, 1.4, 1.5, and 1.16(a) of the Rules of Professional Conduct.
Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent’s actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass’n v. Reis, 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and 12imitigating circumstances. Louisiana State Bar Ass’n v. Whittington, 459 So.2d 520 (La.1984).
Considering the two counts of formal charges together, we find the overall baseline sanction for respondent’s misconduct is a lengthy suspension from the practice of law. See In re: Levingston, 96-1379 (La.12/6/96), 685 So.2d 105 (lawyer suspended for two years for mismanagement of a trust, including failure to provide ac-countings to the beneficiaries or maintain trust records); In re: Armato, 07-0500 (La.6/1/07), 958 So.2d 650 (one year and one day suspension imposed upon a lawyer who neglected legal matters, failed to communicate with clients, and failed to protect clients’ interests upon termination of the representation).
Several aggravating factors are present, including a pattern of misconduct, multiple offenses, vulnerability of the victim, and substantial experience in the practice of law. In mitigation, we find respondent does not have a prior disciplinary record, and has suffered personal or emotional problems.
As a trustee, respondent had a fiduciary duty to maintain records of the trust. In that duty, respondent failed abysmally. As such, a penalty in excess of that usually *106 warranted for such misconduct is appropriate. Accordingly, we will suspend respondent from the practice of law for a period of two years.
DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that John E. Demoruelle, Louisiana Bar Roll number 4860, be and he is hereby suspended from the practice of law for a period of two years. All costs and expenses in the matter are assessed against respondent in accordance with Supreme |S2Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.
WEIMER, J., concurs in part, dissents in part.
1,1 concur in the decision the respondent engaged in conduct that subjects him to sanctions, but dissent from the imposition of a two-year suspension. Although I agree that a suspension should be imposed, I dissent because I believe the sanction imposed is excessive.

.The structured settlement payments were as follows:
1) $375,000 payment on December 30, 1980;
2) $3,000 per month for five years commencing January 30, 1981;
3) $40,000 payment on December 30, 1985;
4) $4,000 per month for five years commencing January 30, 1986;
5) $60,000 payment on January 30, 1991;
6) $5,000 per month for five years commencing on January 30, 1991; and 7)$100,000 final payment on January 30, 1996.

. From the record, it appears that nothing came of this claim.

. Respondent was no longer receiving a portion of the attorney's fees as he and Mr. Hebert had ended their partnership.

. Respondent had been a candidate for judge of the 33[1]'<* Judicial District Court. In a letter to the ODC’s auditor, respondent asserted that ‘‘[Charles], through his family authorized the contribution.” However, when contacted by the ODC to confirm respondent's statement, Mrs. Manuel was adamant that she had not authorized the payment.

. In 1999, respondent did not send the notification until May 27th. In 2000, respondent did not send the notification until June 26th.

. Mrs. Hollier is a close friend of the Demor-uelle family who has helped to provide care for respondent's mentally ill wife.

. Respondent acquired the services of an accident reconstruction expert and took him to the accident site. He was also consulted about Charles' wife's claim on the settlement, which resulted in a $40,000 payment to her.

. The payment schedule, as modified on May 13, 1983 and approved by the court on May 16, 1983, was as follows:
A) Immediate payment of $35,000;
B) $500 per month from June 1, 1983 until
December 30, 1985;
C) $25,000 on December 30, 1985; and
D)$1,000 per month from January 30, 1986 until the entire fee of $103,666.66 is paid.

. Respondent stated all of the nursing expense checks for Mrs. Manuel and Carmel were made out to cash because they were “obviously not reporting it on their income tax.”

. During the time he was trustee, respondent also did insurance defense work for other clients, which work he was able to complete to their satisfaction.

. The board noted that comment (b) of La. R.S. 9:2181, which deals specifically with trustee compensation, states if the trust in-stmment does not state the amount of the fee, then the fee charged by the trustee should be reviewed by the proper court.